<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u><br><u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                        :
ROBERT L. INGLE,                        :
                                        :
            Plaintiff,                  :
                                        :        Civil Action No. 07-590 (JAG)
      v.                                :
                                        :            **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY ADMINISTRATION,                :
                                        :
            Defendant.                  :
_____:

### <u>GREENAWAY, JR., U.S.D.J.</u>

Plaintiff Robert L. Ingle ("Plaintiff") seeks review of the decision by the Commissioner of Social Security Administration ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).[1] Plaintiff argues that the decision is not supported by substantial evidence, as required by § 405(g), and that the Commissioner erred as a matter of law in denying his applications. For the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is supported by substantial evidence, and shall be affirmed.

---

[1] This section of the Social Security Act provides that any individual may obtain a review of any final decision of the Commissioner made subsequent to a hearing to which he or she was a party. The federal district court for the district in which the plaintiff resides is the appropriate place to bring such action. 42 U.S.C. § 405(g).

# I. <u>PROCEDURAL HISTORY</u>

Plaintiff filed an application for SSI, pursuant to Section 1614(a)(3)(A) of the Act, codified at 42 U.S.C. § 1382c(a)(3)(A), with a protective application date of December 22, 2003. (Tr. 19.)  On January 9, 2004, Plaintiff filed an application for DIB, pursuant to Sections 216(i) and 223 of the Social Security Act ("the Act"), codified at 42 U.S.C. §§ 416(i) and 423, respectively.[2]  (Tr. 19, 57-59.)[3]   Plaintiff's applications alleged that his disability commenced on July 18, 2002 due to chronic back pain, arthritis in both knees, severe back spasms, problems with his spinal cord, osteoarthritis of the left knee, and insomnia.  (Tr. 19.)  After Plaintiff's claims were denied initially (Tr. 30), and on reconsideration (Tr. 39), Plaintiff timely filed a request for a hearing before an administrative law judge.  (Tr. 43, 46-47.)

Administrative Law Judge Richard L. De Steno ("ALJ De Steno") held a hearing on Plaintiff's claims.  (Tr. 27.)  He denied Plaintiff's claims in a decision dated October 21, 2005. (<u>Id.</u>)  ALJ De Steno concluded that Plaintiff was not entitled to a Period of Disability and DIB, nor was he eligible for SSI payments, under Sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Act.  ALJ De Steno found that:

> 1.    The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for

---

[2]  The record shows that Plaintiff has previously filed an application for disability benefits on January 8, 1996, which was denied by an administrative law judge on December 16, 1997, with no further appeal.  (Tr. 19.)  The record also shows that Plaintiff subsequently filed another application for disability benefits on March 19, 2003, (Tr. 227-29), which was denied at the initial level on June 9, 2003, (Tr. 232), with no further appeal.  (Tr. 19.)

[3]  The Act instructs the Commissioner to file, as part of the answer, a certified copy of the transcript of the record, including any evidence used to formulate his conclusion or decision.  42 U.S.C. § 405(g).  Hereinafter, "Tr." refers to said transcript.

the benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's severe impairment involves a herniated disc and degenerative disc disease of the lumbar spine, and they are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(c).

4.    These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    I find that the claimant's subjective complaints of pain, symptoms, and limitations are not totally credible for the reasons set forth in the body of the decision.

6.    At all material times, the claimant retained the residual functional capacity for a full range of light work.

7.    The claimant's past relevant work as a security monitor for Burns International did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

8.    The claimant's medically determinable herniated disc and degenerative disc disease of the lumbar spine do not prevent the claimant from performing his past relevant work.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(Tr. 26.)

Plaintiff requested a review of ALJ De Steno's decision on November 2, 2005.  (Tr. 14-15.)  On January 12, 2007, Plaintiff's request was denied by the Appeals Council.  (Tr. 6.)

Accordingly, ALJ De Steno's decision became the Commissioner's final determination.  On

February 5, 2007, Plaintiff filed a complaint in this Court, pursuant to 42 U.S.C. §§ 1383(c)(3)

and 405(g), seeking reversal of the Commissioner's decision.

## II. STATEMENT OF FACTS

### A.    Background

Plaintiff Robert L. Ingle ("Plaintiff") was born on November 12, 1966.  (Tr. 28, 68.)

Plaintiff is five feet, eight inches tall, and weighs approximately 140 to 170 pounds.  (Tr. 71,

264, 312, 341.)  Plaintiff is a high school graduate.  (Tr. 75.)

From 1998 to 2001, Plaintiff worked as a railroad welder, his longest period of

employment in one position.  (Tr. 79.)  At that job, Plaintiff worked for twelve hours each day,

during which he was required to walk or stand for about eleven hours; climb, stoop, kneel,

crouch, or crawl for a major part of his work day; sit for one hour; and lift objects weighing fifty

to 100 pounds or more.  (Tr. 73.)  The most recent job Plaintiff held was his position as a security

video surveillance monitor, which required Plaintiff to sit and look at the screen most of the day,

and to perform a fifteen-minute walking tour once every hour.  (Tr. 79, 419-420.)  Plaintiff

stopped working on or about July 18, 2002,[4] claiming that he was "no longer able to do the job."[5]

(Tr. 72, 75, 78.)

Plaintiff lives with his common law wife, who was at one point involuntarily committed

to a mental institution due to "a chemical imbalance of her medication."  (Tr. 22, 434.)  His

---

[4]  Plaintiff's January 9, 2004 application for DIB lists July 18, 2002 as his last day of
employment at Burns International.  (Tr. 78.)  However, at the hearing in front of ALJ De Steno
Plaintiff testified that he last worked in 2000.  (Tr. 419.)  ALJ De Steno relied on Plaintiff's
testimony (that he has not worked since 2000) in rendering his opinion.

[5]  At the hearing before ALJ De Steno, Plaintiff testified that he stopped working at Burns
International because he was "planning on relocation and did not go through with [his] plans,"
and that he therefore quit without being properly prepared for the move.  (Tr. 420.)

doctor recommended a home health aide, who comes to his home five days per week for two hours a day.  (Tr. 424-25.)  The home health aide does various household chores, including cleaning, cooking, and grocery shopping, and helps Plaintiff shower, shave, and put acne medication on his back.  (Tr. 425)

Since the age of sixteen, Plaintiff has smoked a half to a full pack of cigarettes each day. (Tr. 359.)

**B.      Claimed Disabilities**

Plaintiff complains of chronic back pain, arthritis in both knees, severe back spasms, problems with his spinal cord, osteoarthritis of the left knee, and insomnia.  (Tr. 68, 71.) Plaintiff claims that his disability commenced on October 1, 2002, and that he first became unable to work on July 18, 2002.  (Tr. 72.)  Plaintiff testified that he has been having back problems ever since his last week on the job as a surveillance monitor, when he slipped down the stairs and "twisted [his] back a little bit."  (Tr. 21, 421.)

Plaintiff claims that his injuries prevent him from sitting or standing for long periods of time, and that he has difficulty walking.  (Tr. 71.)  To describe the pain, Plaintiff stated "The pain is so great that I can't sleep at night."  (Tr. 96.)  The pain feels "like a 400 pound person standing on [his] back," Plaintiff states, and at times "it hurts so bad [he is] in tears."  (Tr. 103, 105.)

Plaintiff also claims to have problems with his memory and concentration.  (Tr. 22, 102, 422.)  Plaintiff testified that he was "majorly depressed," and exhibited "severe mood swings from not working, and frustrat[ion] trying to find work."  (Tr. 421.)  Plaintiff was also diagnosed

5

with non-insulin diabetes mellitus[6]  (Tr. 23, 432), and asthma, for which he uses an inhaler twice a day.  (Tr. 22, 433.)

**C.**    **Medical Evidence in Plaintiff's Current Application**

In evaluating the medical evidence, ALJ De Steno considered medical reports submitted with  Plaintiff's current and prior applications for SSI and DIB.

1.    Dr. Luis Vassallo

Dr. Luis Vassallo conducted a physical examination of Plaintiff on April 5, 2004.  (Tr. 154.)  He recorded Plaintiff's complaints as constant sharp pain between the shoulder blades, radiating up to his neck; periodic swelling; and constant pain and stiffness in his left knee.  (Tr. 155.)

Dr. Vassallo noted that, during the physical examination, Plaintiff exhibited a full range of motion in both elbows and wrists, as well as in his hips, knees, and ankles.  (Tr. 155.)  Plaintiff was able to sit comfortably and bend down to remove his shoes.  (Id.)  Plaintiff could also "separate papers, button and unbutton with both hands, climb[] to the examining table and, while sitting, . . . bring both lower extremities parallel to the floor without any back pain."  (Id.)

Dr. Vassallo concluded that Plaintiff had no neurological deficits in his arms and legs, that his joints were within normal range of motion, and that he could manipulate his hands normally.  (Tr. 155-56.)  Dr. Vassallo also stated that Plaintiff did not need a "hand-held assistive device."  (Tr. 156.)

---

[6]  Diabetes mellitus is defined as "a complex disorder of carbohydrate, fat, and protein metabolism that is primarily a result of a deficiency or complete lack of insulin secretion by the beta cells of the pancreas or resistance to insulin."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 511 (6th ed. 2002).

2.      Dr. Anthony Enrico

Dr. Anthony Enrico, a podiatrist, conducted an examination of Plaintiff on September 2, 2004.  Plaintiff complained to Dr. Enrico that, for several weeks, he had experienced pain in the heels and arches of both feet.  (Tr. 159.)  Dr. Enrico noted that Plaintiff walked into the office with a limp.  (Id.)

Dr. Enrico stated that "[t]he examination of both feet does show tenderness and pain upon direct palpation of the plantar medial aspect of both heels with calcaneal bursitis noted."  (Id.)  X-rays in two views of both feet showed a small calcaneal spur.[7]  (Tr. 160.)  Soft tissue ultrasound tests of both feet confirmed a diagnosis of an inflammation of connective tissue of the soles of the feet.  (Id.)  There were no signs of any fracture, bone tumors, or infections.  (Id.)

Dr. Enrico ultimately diagnosed Plaintiff with plantar fasciitis.  (Id.)  Dr. Enrico prescribed twenty-five miligrams of Vioxx tablets for Plaintiff to take once daily, and recommended that Plaintiff use a cane.  (Id.)

3.      Dr. Irina Yegudkina[8]

Dr. Irina Yegudkina, Plaintiff's primary care physician at the time, ordered an MRI to examine Plaintiff's lumbar spine, which was performed on October 4, 2004.  (Tr. 161, 197, 201.)

---

[7]   A calcaneal spur is defined as an "abnormal, often painful bony outgrowth on the lower surface of the [heel bone], resulting from chronic traumatic pressure on the heel." MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 262 (6th ed. 2002).

[8]   Dr. Yegudkina's name is misspelled as "Dr. Yegdkina" in ALJ De Steno's opinion (Tr. 21).  Her name is misspelled as "Dr. Yegudrina" on the MRI report dated October 8, 2004 (Tr. 161).

The MRI report, dated October 8, 2004, showed that Plaintiff had a herniated disc[9] at L5-S1, bulging annulus,[10] and a degenerative disc process at the L1-L2 level.  (Tr. 161.)  Dr. Yegudkina also found a mild "narrowing of the neural foramina"[11] at the L5-S1 level, "secondary to the bulging annulus," as well as "slight hypertrophy in the facet points, most prominent at L5-S1 and L4-L5."  (Id.)

On December 3, 2004, Dr. Yegudkina wrote on a prescription blank that Plaintiff "presently is disabled," and listed the following diagnoses: chronic lower back pain, herniated disc, asthma, osteoarthritis,[12] and insomnia.  (Tr. 162.)  Dr. Yegudkina recommended that Plaintiff employ a home health aide to provide assistance five days a week, for two hours each day.  The home health aide assisted Plaintiff with showering, shaving, and dressing, and performed household tasks such as food preparation, cleaning, and grocery shopping.  (Tr. 201-

---

[9]  A herniated disc is defined as "a rupture of the fibrocartilage surrounding an intervertebral disc, releasing the nucleus pulposus that cushions the vertebrae above and below. The resultant pressure on spinal nerve roots may cause considerable pain and damage the nerves, resulting in restriction of movement."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 808 (6th ed. 2002).

[10]  Annulus is defined as "any ring-shaped structure, such as the outer edge of an intervertebral disc."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 102 (6th ed. 2002).

[11]  Foramina is the plural form of "foramen," which is defined as "an opening or aperture in a membranous structure or bone, such as the apical dental foramen and the carotid foramen."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 698 (6th ed. 2002).

[12]  Osteoarthritis is defined as "a form of arthritis in which one or many joints undergo degenerative changes . . . .  The disease usually begins with pain after exercise or use of the joint. Stiffness, tenderness to the touch, crepitus, and enlargement develop; deformity, incomplete dislocation, and synovial effusion may eventually occur.  Involvement of the hip, knee, or spine causes more disability than osteoarthritis of other areas."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1241-42 (6th ed. 2002).

03.)  Plaintiff has received services from a home health aide since April 11, 2005.  (Tr. 174.)

      4.     <u>Physical Residual Functional Capacity Assessment</u>

On November 26, 2004, a physical residual functional capacity assessment of Plaintiff was conducted.  (Tr. 166-171.)  The assessment established that Plaintiff could frequently lift and/or carry up to ten pounds, occasionally lift or carry up to twenty pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitations.  (Tr. 167.)  The assessment also established that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, due to his history of asthma.  (Tr. 169.)  The examining medical consultant determined that Plaintiff's allegations of disability were "partially credible," based on the medical evidence.  (Tr. 170.)

      5.     <u>Dr. Nizor Kahf</u>

Plaintiff visited Dr. Nizor Kahf, a doctor specializing in internal medicine and cardiology, during the period running from September 14, 2004 through July 18, 2005.  (Tr. 386-412.) During his visits, Plaintiff consistently complained of back pain, leg pain, insomnia, acid reflux, chest discomfort, and a cough.  (<u>Id</u>.)  Plaintiff was prescribed various medications, and was also told to stop smoking on account of his chest pain and cough.  (<u>Id</u>.)

The most recent medical report in the record is a medical assessment of Plaintiff's ability to do work-related activities, conducted by Dr. Kahf on July 18, 2005.  (Tr. 172-73.)  Dr. Kahf diagnosed Plaintiff with lumbar radiculitis[13], severe osteoarthritis, and mood disorder.  (Tr. 172.) Dr. Kahf found that Plaintiff could lift and/or carry less than ten pounds, as well as stand and/or

---

[13]  Radiculitis is defined as "an inflammation involving a spinal nerve root, resulting in pain and hyperesthesia."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1458 (6th ed. 2002).

walk less than two hours in an eight-hour workday.  Plaintiff also would alternate sitting and standing to relieve pain or discomfort.  Dr. Kahf noted that Plaintiff's ability to push and pull is limited in both his upper and lower extremities.  (Tr. 172-73.)

**D.**     **Medical Evidence in Plaintiff's Previous Application**

On March 19, 2003, Plaintiff filed an application for DIB.  (Tr. 227-29.)  In the application, he alleged that he has been unable to work because of his disability since July 18, 2002.  (Tr. 227.)  On June 24, 2003, that application for DIB was denied.  (Tr. 232.)  The Social Security Administration's determination was based on the following medical evidence: (1) a March 18, 2003 report by Dr. Herminia W. Hermogenes; (2) medical records from Dr. Robert Rizzo for the period beginning November 21, 2000 through October 4, 2002; (3) a February 11, 2003 report from St. Joseph's Hospital; and (4) a May 2, 2003 examination report from Diagnostic Health Services, conducted by Dr. Edmond B. Balinberg.  (Id.)

    1.     Dr. Herminia W. Hermogenes

On March 18, 2003, the Division of Disability Determination in the New York State Office of Temporary and Disability Assistance requested that Dr. Herminia W. Hermogenes, a psychiatrist, complete a mental assessment of Plaintiff in connection with his application for Social Security benefits.  (Tr. 260-63.)  In the assessment form, Dr. Hermogenes noted that Plaintiff was diagnosed with depression NOS[14], and that Plaintiff's alcohol and cannabis

_____

[14]  When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of "NOS," meaning "Not Otherwise Specified," is given. A diagnosis followed by "NOS" does not put the principal diagnosis in doubt.  Honorable Jessie B. Gunther, Reflections on the Challenging Proliferation of Mental Health Issues in the District Court and the Need for Judicial Education, 57 ME. L. REV. 541, 552 n.43 (2005) (defining NOS).

dependence was in sustained full remission.  (Tr. 262.)  Dr. Hermogenes concluded that

Plaintiff's "history was significant for a learning disability," and referred him to North General

Hospital Mental Health Clinic for a psychiatric follow-up.  (Tr. 263.)  Dr. Hermogenes also noted

that Plaintiff had a GAF[15] score of 45.  (Tr. 262.)

      2.   <u>Dr. Robert Rizzo</u>

The record contains four patient progress notes from Dr. Robert Rizzo for dates ranging

between November 21, 2000 through October 04, 2002.  (Tr. 244-47.)  Plaintiff complained

about back and chronic knee pain, joint pain, and depression.  (Tr. 245-47.)  A radiologic

examination of Plaintiff's lumbar spine, performed on June 18, 2002 at Dr. Rizzo's request,

showed that Plaintiff had very minimal degenerative changes in the zygapophyseal[16] joint of L5-

S1 on the right side.  (Tr. 245.)

      3.   <u>St. Joseph's Hospital and Medical Center</u>

On February 11, 2003, Plaintiff was admitted to St. Joseph's Hospital and Medical

Center's emergency room with recurrent vomiting, abdominal pain, and a cough.  (Tr. 248-52.)

---

[15] A GAF (Global Assessment of Functioning) scale ranges from 0 to 100.  Generally, a lower score indicates a more serious mental disorder.  A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities." American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000).  A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  <u>Id.</u>

[16] A zygapophyseal joint, also called a facet joint, is defined as a "synovial joint between articular processes of the vertebrae."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 651 (6th ed. 2002).  A synovial joint, in turn, is defined as "a freely movable joint in which contiguous bony surfaces are covered by articular cartilage and connected by a fibrous connective tissue capsule lined with synovial membrane."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1670 (6th ed. 2002).

The emergency department triage notes stated that this was Plaintiff's fourth visit to the emergency room for vomiting in two weeks.  (Tr. 252, 254.)  An x-ray did not show any abnormalities, while a CT[17] scan showed a possible concern for appendicitis.  (Tr. 257, 259.) Ultimately, Plaintiff was given Pepcid.[18]  (Tr. 254.)

> 4.  Dr. Edmond B. Balinberg

Dr. Edmond B. Balinberg conducted an internal examination of Plaintiff on May 2, 2003. (Tr. 264-65.)  He noted that Plaintiff had a history of gastoesophageal reflux disorder[19] ("GERD"), and that he had a scar on the left side of his face where a keloid had been removed two weeks prior to the examination.  (Tr. 265.)  Dr. Balinberg diagnosed Plaintiff with lower back disorder and possible internal derangement in the left knee, but also noted that all of Plaintiff's systems appeared normal.  (Id.)

Dr. Balinberg ordered a radiographic examination of Plaintiff's spine and left knee.  (Tr. 266-67.)  The report, prepared by radiologist Dr. Seymour Sprayregen, stated that Plaintiff had a five-degree levoscoliosis at L4, and a disc thinning at L5-S1.  (Tr. 266.)  The report found that

---

[17]  CT is an abbreviation for "computed tomography," which is defined as "a radiographic technique that produces an image of a detailed cross section of tissue. . . . The computer calculates tissue absorption and produces a representation of the tissues that demonstrates the densities of various structures.  Tumor masses, infractions, bone displacements, and accumulations of fluid may be detected."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 408 (6th ed. 2002).

[18]  Pepcid is a trademark for an antiulcer drug.  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1308 (6th ed. 2002).

[19]  A gastroesophageal reflux is defined as "a backflow of contents of the stomach into the esophagus that is often the result of incompetence of the lower esophageal sphincter.  Gastric juices are acid and therefore produce burning pain in the esophagus."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 725 (6th ed. 2002).

views of Plaintiff's left knee showed no evidence of acute fracture, dislocation, or destructive bony lesion.  (Tr. 267.)

After analyzing the radiology report, Dr. Balinberg concluded that Plaintiff possessed the functional capacity to do work-related activities, although he had a limited ability to bend, lift, carry, push and pull heavy loads frequently, as well as a limited ability to go up and down stairs. (Tr. 268.)

**E.     Additional Medical Evidence**

       1.     Dr. M. B. Thimmaiah

The record contains progress reports with dates ranging from January 30, 1997 through January 24, 2000.  The reports were prepared by Dr. M. B. Thimmaiah at Harbor House, a psychiatric rehabilitation center at St. Joseph's Hospital and Medical Center ("St. Joseph's Hospital").  (Tr. 216-26.)  Plaintiff enrolled in St. Joseph's Hospital's Mental Health Clinic (the "Mental Health Clinic") when he was thirty years old, for what he reported to be depression.  (Tr. 222.)  The Mental Health Clinic referred Plaintiff to Harbor House, where he was initially diagnosed with atypical depression / atypical anxiety / atypical psychosis.  (Tr. 222-23.)  He was not prescribed any psychotropic medication, but remained in the rehabilitation program for ongoing psychosocial and vocational rehabilitation.  (Tr. 223.)

The second report from Harbor House, dated August 27, 1997, changed Plaintiff's diagnosis to "depression NOS, by history."  (Tr. 220.)  The later reports include this same diagnosis.  (Tr. 218-21.)  Plaintiff ultimately remained in the rehabilitation program for approximately three years.  (Tr. 216-23.)

2.     North General Hospital

On April 16, 2003, Plaintiff was admitted to North General Hospital in New York City, New York, for an ambulatory surgery.  (Tr. 352.)  Plaintiff was diagnosed with bilateral cheek sebaceous cysts,[20] and a wart in the left angle of the mouth.  (Tr. 352-71.)  An ambulatory surgery, consisting of an excision of the sebaceous cysts and the wart, was performed successfully and without complications.  (Id.)

Beginning in May of 2003, Plaintiff repeatedly returned to the North General Hospital with complaints of chronic back pain, severe pain in the left knee, and GERD.  (Tr. 298-323.)  On May 19, 2003, Plaintiff was referred to an orthopaedic specialist.  (Tr. 323.)  The referral stated that Plaintiff complained of constant and severe pain in the left knee, while the X-ray revealed no pathology.  (Id.)  Plaintiff returned to the hospital and complained of the same problems on June 11, 2003 (Tr. 320-22); June 24-25, 2003 (Tr. 314-16); July 16, 2003, (Tr. 298); August 26, 2003 (Tr. 304-05); and November 4, 2003 (Tr. 299).  Each time, Plaintiff was told to stay on the medication prescribed before.  On August 27, 2003, an MRI of Plaintiff's left knee was performed and showed a synovial[21] cyst, but no evidence of a meniscal[22] tear.  (Tr. 302.)

---

[20]  A sebaceous cyst is defined as "a misnomer for an epidermoid cyst or a pilar cyst." MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1549 (6th ed. 2002).

[21]  Synovial is defined as "pertaining to, consisting of, or secreting synovia, the lubricating fluid of the joints, bursae, and tendon sheaths."  MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1670 (6th ed. 2002).

[22]  Meniscus is defined as "a curved, fibrous cartilage in the knees and other joints." MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 1078 (6th ed. 2002).

## III.  DISCUSSION

### A.       Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. §

405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial

evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Servs., 841

F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir.

1984)).

In determining whether there is substantial evidence to support the Commissioner's

decision, the reviewing court must consider "(1) the objective medical facts; (2) the diagnoses

and expert opinions of treating and examining physicians on subsidiary questions of fact; (3)

subjective evidence of pain testified to by the claimant and corroborated by family and neighbors;

and (4) the claimant's educational background, work history and present age."  Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D. N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence that may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.     Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5)(A).  To qualify for DIB, a claimant must first establish that he is "disabled."  42 U.S.C. § 432(a)(1).  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  That is, the claimant's impairment must be so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, they alone are insufficient to establish a disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.     The Five-Step Evaluation Process And The Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[23]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled," and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two, in which the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.

If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process by comparing the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit Court of Appeals found that, if denying the applicability of other listings[24] at step three, the ALJ must specify which listings apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that

---

[23]  Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[24]  Hereinafter, "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

"Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (Id.)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant [l]isting."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At step five, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number

of jobs that the claimant can perform, the claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(a).  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When the vocational factors coincide with all of the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 467 (1983).  The claimant, however, may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "[T]he combined impact of the impairments will be considered throughout the disability determination process."  20 C.F.R. § 1523; see also 42 U.S.C. § 423(d)(2)(B); Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  The burden, however, remains on the claimant to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would

have resulted in a qualifying disability); <u>see also</u> <u>Marcus v. Barnhart</u>, No. 02-3714, 2003 WL

22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [claimant] to show

that the combined effect of her impairments limited one of the basic work abilities").

      While <u>Burnett</u> involved a decision in which the ALJ's explanation of his step three

determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit

applies its procedural requirements, as well as its interpretation of <u>Jones</u>, to every step of the

decision.  <u>See, e.g.</u>, <u>Rivera v. Comm'r</u>, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir.

Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and

analysis to allow for meaningful judicial review," but need not "adhere to a particular format."

<u>Id.</u>

**D.**     **ALJ De Steno's Findings**

      ALJ De Steno applied the five-step sequential evaluation, and determined that Plaintiff

was not disabled within the meaning of the Act.  (Tr. 22-26.)

      1.     <u>Step One</u>

      ALJ De Steno found that Plaintiff satisfied step one of the evaluation, since the record

reflected that Plaintiff "has not engaged in any substantial gainful activity since his alleged onset

date" of July 18, 2002.  (Tr. 23.)

      2.     <u>Steps Two and Three</u>

      Regarding steps two and three of the analysis, ALJ De Steno found that "the evidence

establishes the existence of a 'severe' impairment involving a herniated disc and degenerative

disc disease of the spine, but does not disclose any medical findings which meet or equal in

severity the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations

20

No. 4." (Tr. 23.)

ALJ De Steno stated that "the medical evidence fails to establish the existence of a severe impairment involving depression." (Tr. 25.) To support this conclusion, ALJ De Steno analyzed the medical evidence of Dr. Hermogenes, who diagnosed Plaintiff with depression in March 2003. He noted that "[w]hile the claimant's mood was *reported* to be sad, he was fully oriented; his impulse control was good; and his memory, concentration, cognition, intelligence, and judgment were intact." (Tr. 23) (emphasis in original.) Therefore, ALJ De Steno found, Dr. Hermogenes's conclusion that Plaintiff had a GAF score of 45 contradicted the medical findings in the report itself, and should therefore be disregarded. (Id.)

ALJ De Steno also noted Plaintiff's testimony at the hearing that he "only takes psychotropic medication prescribed by his primary care physician, not a psychiatrist," and that he has not seen a psychiatrist because "his primary physician did not feel that he needed treatment from a mental health professional." (Id.; Tr. 422-23.) Therefore, ALJ De Steno concluded that Plaintiff's depression was not a severe limitation on his ability to function. (Tr. 23.)

ALJ De Steno also concluded that the evidence in Plaintiff's medical file failed to establish that Plaintiff's asthma and diabetes constitute severe impairments. (Id.) There was no evidence that Plaintiff required emergency room treatment, hospitalization, or intubation for his asthma. (Id.) Moreover, the fact that Plaintiff smoked between a half to a full pack of cigarettes a day directly contradicted Plaintiff's assertion that he could not tolerate fumes in the air due to his asthma, since smoking entails "the intentional channeling of noxious smoke and fumes into the lungs." (Id.) ALJ De Steno also found that, since Plaintiff was diagnosed with diabetes mellitus only two to three months prior to the hearing, the ailment did nor meet the twelve-month

durational requirement mandated by the Regulations, and therefore did not qualify as a "severe"

impairment.  (Id.)

Next, ALJ De Steno explained that Plaintiff's spinal impairments do not satisfy any of the

listings.  (Id.)  ALJ De Steno explained that Plaintiff's subjective complaints of disabling pain,

including his assertions about limitations on sitting, standing, walking, lifting, and carrying, "are

in variance with the medical evidence."  (Tr. 24.)  Specifically, ALJ De Steno stated that,

"[w]hile the claimant's complaints of back pain could reasonably partially be attributed to his

herniated disc, I find that the claimant's extreme complaints of pain and limitation are not severe

to the degree alleged."  (Id.)  ALJ De Steno noted that there was no evidence in the record that

Plaintiff had spinal cord or nerve root impingement, nor that Plaintiff had been prescribed

physical therapy or recommended to undergo surgical intervention.  (Tr. 25.)

ALJ De Steno also found Plaintiff's allegation of difficulty lifting his arms to be

untenable.  Dr. Balinberg noted in his May 2, 2003 report that Plaintiff had full range of motion

of both arms.  (Tr. 265.)  Furthermore, Dr. Vassallo concluded on April 5, 2004 that Plaintiff had

"no neurological deficits in both upper and lower extremities.  All the joints examined were

within normal range of motion without any deformities."  (Tr. 155.)

With regard to Plaintiff's allegation of bilateral knee pain, ALJ De Steno found that

Plaintiff's "subjective complaints of pain are far in excess of what could reasonably be expected

from his medical condition and the objective medical evidence."  (Tr. 24.)  An x-ray of Plaintiff's

left knee, ordered by Dr. Balinberg on May 2, 2003, showed no problems with Plaintiff's left

knee.  (Tr. 267.)  While the MRI of Plaintiff's left knee performed at the North General Hospital

on August 27, 2003 showed a synovial cyst, there was no evidence of a meniscal tear.  (Tr. 302.)

In reaching these conclusions, ALJ De Steno gave no significant weight to Dr. Yegudkina's declaration that Plaintiff is disabled (Tr. 162), since the opinion is "an issue totally reserved for the Commissioner," and is unsupported by the medical evidence.  (Tr. 24-25.) Therefore, ALJ De Steno determined that the opinion should not be accorded any weight.  (Tr. 24.)  Likewise, ALJ De Steno gave no significant weight to Dr. Kahf's residual functional capacity assessment (Tr. 172-73), since it was not supported by Dr. Kahf's own findings and the record as a whole.  (Tr. 25.)

      3.      <u>Step Four</u>

In the fourth step of his analysis, ALJ De Steno found that Plaintiff possesses the residual functional capacity to perform his past relevant work "as a security monitor."  (Tr. 26.)  Plaintiff testified that, in his last position as a security monitor, he sat and monitored a security monitor for most of the day, lifted and carried less than ten pounds, and performed a fifteen-minute tour of the facility every hour.  (Tr. 26.)  ALJ De Steno concluded that Plaintiff "is capable of performing his past relevant work as a security monitor."  (Tr. 26.)

**E.**      <u>**Analysis**</u>

Plaintiff contends that ALJ De Steno's decision should be reversed because his decision is not supported by substantial evidence, and that ALJ De Steno erred as a matter of law in applying an incorrect legal standard when denying Plaintiff's claim for SSI and DIB. Specifically, Plaintiff argues that: (1) the ALJ failed to give proper credence to Plaintiff's subjective complaints (Pl.'s Mem. 13); (2) the ALJ failed to consider all of the medical evidence in combination and therefore "improperly evaluated the medical evidence" when finding that Plaintiff's impairments did not meet or equal a listing (Pl.'s Mem. 23-24); and (3) the ALJ's

determination of Plaintiff's residual functional capacity to perform his past relevant work is not supported by the medical evidence (Pl.'s Mem. 25).

1.      Whether ALJ De Steno Properly Evaluated the Medical Evidence Concerning Plaintiff's Subjective Complaints of Pain

Plaintiff claims that ALJ De Steno "failed to give proper credence to the complaints of [Plaintiff] concerning his pain, limitation of motion and function, weakness, numbness, swelling and spasms, asthma and pulmonary impairment and mental impairments including anxiety, hallucinations, suicidal ideations, depression, loss of concentration, low self esteem, loss of appetite and insomnia." (Pl.'s Mem. 13.) Plaintiff argues that he "testified to his impairments at the hearing" and that they are supported by "all of the medical reports." (Id.) Upon review of Plaintiff's subjective complaints, however, ALJ De Steno found them to be "grossly inconsistent with the objective medical evidence of record [that] can only be characterized as hyperbole." (Tr. 24.) Plaintiff contends that, when a claimant's testimony of subjective pain is supported by the medical evidence, it should be entitled to great deference. (Id.)

The ALJ must give consideration to the claimant's subjective complaints of pain. 20 C.F.R. § 404.1529(a); Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986). Subjective complaints alone, however, will not establish that a claimant is disabled. 20 C.F.R. § 404.1529(a). Although "assertions of pain must be given serious consideration," Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), a claimant still "bears the burden of demonstrating that her subjective complaints were substantiated by medical evidence." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996). Accordingly, subjective claims of pain and impairment "will not alone establish . . . [disability]; there must be medical

signs and laboratory findings . . . [demonstrating] medical impairments, which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). "Even in situations where a subjective complaint of pain coincides with a known impairment, it is within the discretion of an ALJ to discount that claim if there is a rational basis to do so." Alexander, 927 F. Supp. at 795.

In evaluating a claimant's subjective complaints of pain, the ALJ must adhere to the standard set forth in Caruso v. Comm'r of Soc. Sec., 99 F. App'x 376, 380-81 (3d Cir. 1999). First, the ALJ must determine from objective medical evidence whether the claimant suffers from a medically determinable impairment capable of causing the alleged symptoms. 20 C.F.R. § 404.1529; Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). If such an impairment is present, the ALJ must make an independent determination regarding the intensity, persistence, or functionally limiting effects of the symptoms on the claimant's ability to work. See 20 C.F.R. § 404.1529(a). If the extent of the claimant's pain or other symptoms exceeds what can be substantiated by objective medical evidence, the ALJ must then determine the level of restriction that the impairment may reasonably cause the claimant, based on statements and all other evidence in the record. Id.

The ALJ carefully considered Plaintiff's subjective complaints of "disabling pain and other symptoms and limitations precluding all significant work activity, especially regarding his assertions about limitations on sitting, standing, walking, lifting, and carrying," (Tr. 23-24), resulting from his impairments to the spine and the left knee. ALJ De Steno then concluded that the objective medical evidence in the file does not support such subjective complaints. (Tr. 24.)

To reach this conclusion, ALJ De Steno analyzed all of the doctors' reports and medical

25

tests, including an October 2004 MRI of Plaintiff's spine, a May 2003 x-ray, and an August 2003 MRI of Plaintiff's left knee.  He found that "[w]hile the claimant may experience some pain and discomfort from his condition, his subjective complaints of pain are far in excess of what could reasonably be expected from his medical condition and the objective medical evidence."  (Tr. 24.)  ALJ De Steno noted an absence in the record of "evidence of spinal cord or nerve root impingement" that would substantiate the great amount of pain described by Plaintiff.  (Id.)  ALJ De Steno also pointed out that Plaintiff visits "his family doctor," and not an orthopedist.  (Id.)

Last, ALJ De Steno states that Plaintiff was never prescribed "a course of physical therapy, pain management, epidural injections, or narcotic pain medications for his complaints . . . ."  (Id.)  By contrasting Plaintiff's complaints with the medical evidence in the record, and noting the significance of the medical evidence *absent* in the record, ALJ De Steno defended his decision to give less weight to Plaintiff's subjective complaints of pain.

Likewise, ALJ De Steno found that Plaintiff's subjective complaints "of difficulty lifting his arms and an inability to lift more than five pounds are in variance with the medical evidence." (Tr. 24.)  The ALJ specifically noted the reports of Drs. Balinberg and Vassallo, which stated that Plaintiff had a full range of motion of his arms and "no evidence of strength or sensory deficits." (Id.)

ALJ De Steno also used objective medical evidence in the record to find that Plaintiff did not have an "asthma and pulmonary impairment."  While Plaintiff was diagnosed with asthma, (Tr. 162, 169), and uses an Albuterol inhaler twice daily, (Tr. 433), ALJ De Steno noted that Plaintiff never "required emergency room treatment, inpatient hospitalization, or intubation due to exacerbation of asthma."  (Tr. 23.)  Moreover, ALJ De Steno properly discarded Plaintiff's

26

testimony that he cannot tolerate fumes in the air, finding that Plaintiff smoked a half to a full

pack of cigarettes a day, which "amounts to the intentional channeling of noxious smoke and

fumes into the lungs."  (Id.)  Plaintiff's asthma therefore did not significantly limit his "physical

or mental capacity to perform basic work-related functions," 20 C.F.R. § 404.1520(c), and did

not constitute a medically determinable impairment.

Finally, ALJ De Steno did not err in concluding from the objective medical evidence that

Plaintiff does not suffer from medically determinable "mental impairments including anxiety,

hallucinations, suicidal ideations, depression, loss of concentration, low self esteem, loss of

appetite and insomnia." (Pl.'s Mem. 13.)  To defend his argument that ALJ De Steno erred in his

conclusion, Plaintiff relies primarily on Dr. Hermogenes' March 2003 report, in which she

diagnosed Plaintiff with "depression NOS" and found that Plaintiff had a GAF score of 45, a

score which involves symptoms like suicidal ideation, severe obsession rituals, or a serious

impairment in social or occupational functioning.  (Tr. 262; Pl. Br. 16.)

Despite these notations on the March 2003 report, Dr. Hermogenes specifically found

Plaintiff's memory and judgment to be fair, his intelligence and cognition to be good, and his

concentration intact.  (Id.)   She observed that Plaintiff did not suffer from any auditory or visual

hallucinations or manic symptoms, and did not have any suicidal or homicidal ideas.  (Id.)  It

was, therefore, not an error of law for ALJ De Steno to conclude that Dr. Hermogenes' objective

findings did not support her assessment that Plaintiff had a GAF score of 45.  (Tr. 23.)

Based on the aforementioned facts supporting ALJ De Steno's decision, this Court finds

that the ALJ gave "proper credence to the complaints of [Plaintiff] concerning his pain,

limitation of motion and function, weakness, numbness, swelling and spasms, asthma and

pulmonary impairment and mental impairments including anxiety, hallucinations, suicidal ideations, depression, loss of concentration, low self esteem, loss of appetite and insomnia." (Pl.'s Mem. 13.)

>    2.    Whether ALJ De Steno Erred in Concluding That Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment

Plaintiff contends that ALJ De Steno "improperly evaluated the medical evidence and found that the plaintiff did not meet or equal a Listed Impairment." (Pl.'s Mem. 23.)  Plaintiff argues that, even if each of his individual impairments does not match or equal a listing, "his individual impairments when taken in combination surely equal the Listings [sic]." (Id.)  Plaintiff further contends that ALJ De Steno "misinterpreted the medical record and found no evidence where, in fact, it did exist." (Id.)

Throughout the five-step evaluation process, the Commissioner is obligated to consider all of the alleged impairments individually and in combination.  42 U.S.C. § 423(d)(2)(B). Plaintiff, however, bears the burden of demonstrating how his impairments, whether individually or in combination, amount to a qualifying disability in the first four steps of the analysis. Burnett, 220 F.3d at 118; Williams, 87 F. App'x at 243.  Moreover, even if Plaintiff can demonstrate that the ALJ did not consider his impairments in combination, the claimant bears the burden of demonstrating an inability to return to his past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

Although ALJ De Steno did not specifically state that he considered Plaintiff's impairments in combination, a careful reading of his opinion indicates that he analyzed the combined effect of all of Plaintiff's impairments.  In analyzing the record, the ALJ is not

obligated to employ particular "magic words," or adhere to a particular format in explaining his decision.  Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 959 (3d Cir. 2006) (citing Jones, 364 F.3d at 505).  In memorializing his decision, the ALJ must ensure "that there is sufficient development of the record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  Furthermore, the ALJ's opinion need not have a specific section dedicated to the assessment of the combined impact of Plaintiff's impairments.  Bryan v. Barnhart, No. 04-191, 2005 U.S. Dist. LEXIS 1493, at *3 (E.D. Pa. Feb. 2, 2005).

ALJ De Steno's conclusion is "[b]ased on the entire record, including the testimony of the claimant."  (Tr. 25.)  Consideration of Plaintiff's pain and physical capabilities is interwoven with the ALJ's assessment of Plaintiff's mental status, thereby suggesting that ALJ De Steno took into account all of Plaintiff's impairments.  (Tr. 23-25.)  The fact that the ALJ does not expressly declare that he is considering Plaintiff's impairments in combination does not render his decision unsupported by substantial evidence.  See Bryan, 2005 U.S. Dist. Lexis 1493 at *4 ("[b]y analyzing and discussing the severity of each of Plaintiff's impairments, [the] ALJ . . . evidenced that she was reviewing the impact of the combination of Plaintiff's impairments").  This Court finds no error regarding ALJ De Steno's step three analysis.

ALJ De Steno's findings under steps two and three of the analysis are sound and supported by the record.  ALJ De Steno cited medical evidence to support his determination that Plaintiff's asthma, diabetes, and depression do not constitute "severe" impairments.  (Tr. 23.)  Furthermore, substantial evidence exists to support ALJ De Steno's conclusion that Plaintiff's

impairments do not match or equal the requirements of medical listing 1.04.[25] (Tr. 23.) ALJ De Steno stated that "the evidence establishes the existence of a 'severe' impairment involving a herniated disc and degenerative disc disease of the spine, but does not disclose any medical findings which meet or equal in severity the clinical criteria of any impairment listed . . . ." (Id.) Plaintiff does not assert that any of his impairments, alone or in combination, should match or equal any other listing.[26]

This Court finds that ALJ De Steno did not err when considering whether Plaintiff's impairments, individually or in combination, satisfy the requirements set forth in steps two and three of the analysis.

    3.    <u>Whether ALJ De Steno Erred in Determining That Plaintiff Retains the Residual Functional Capacity to Perform Light Work</u>

Last, Plaintiff argues that ALJ De Steno's conclusion that Plaintiff retains the residual functional capacity to perform light work "is merely conclusory and is not supported by the medical evidence." (Pl.'s Mem. 25.) Specifically, Plaintiff contends that ALJ De Steno "ignore[d] the fact that plaintiff is unable to sit for any length of time, stand for too long, walk without the assistance of a cane and requires assistance in bathing and dressing himself." (Id.) Plaintiff also contends that the ALJ disregarded "the severity and the significant impact plaintiff's mental impairments would have on his ability to work." (Id.)

At the fourth step of the analysis, the ALJ must consider whether the claimant possesses

---

[25] Listing 1.04 lists such spine disorders as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture." 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, listing 1.04.

[26] Plaintiff does not identify any specific listing when arguing that his impairments satisfy "the Listings."

the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).

Here, ALJ De Steno determined that, "although the claimant has suffered from a medically

'severe' impairment, the evidence establishes that the claimant has the capacity to function

adequately to perform many basic activities associated with work."  (Tr. 25.)  Before reaching his

conclusion, ALJ De Steno specifically noted that Plaintiff's "capacity to perform work has been

significantly affected" due to the pain and limitations associated with his impairments.  (Id.)

Having taken into account all of that evidence, however, ALJ De Steno concluded that Plaintiff

retained "the residual functional capacity for lifting and carrying objects weighing up to 20

pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking, and

sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and the full

range of light work."[27]  (Tr. 26.)

    To support his conclusion, ALJ De Steno emphasized Plaintiff's testimony that, in his last

job as a security surveillance monitor, he was required to perform a fifteen-minute walking tour

every hour, and that Plaintiff spent the rest of his time sitting and monitoring the surveillance

screens.  (Tr. 26.)  These job requirements allow Plaintiff to walk and sit for less than six hours

in an eight-hour work day, in accordance with his residual functional capacity.  (Tr. 167.)

Plaintiff's former position also allow him to frequently alternate sitting and standing, as

recommended by Dr. Kahf.  (Tr. 172-73.)  Additionally, Plaintiff's former job did not require

him to lift or carry objects weighing more than ten pounds, or go up and down the stairs, which

---

[27] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

are the recognized limitations on his ability to perform work.  (Tr. 26.)

Based on a review of all the medical evidence records, this Court finds that substantial evidence supports ALJ De Steno's conclusion that Plaintiff had the residual functional capacity to perform light work, in general, and his past relevant work as a security surveillance monitor, specifically.

**IV.  <u>CONCLUSION</u>**

For the reasons stated above, this Court finds that ALJ De Steno's decision is supported by substantial evidence, and shall be affirmed.

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: May 6, 2008

32